[No. A117659. First Dist., Div. Four. Nov. 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN JOSE MORALES, Defendant and Appellant.

**COUNSEL**

J. Frank McCabe, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, René A. Chacón and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RIVERA, J.**—In this case, we hold that a defendant cannot be convicted of the crime of shooting at an inhabited dwelling if he or she is inside the attached garage of the dwelling and fires gunshots into the house.

Defendant Juan Jose Morales appeals from a judgment entered upon a jury verdict finding him guilty of possession of a firearm by a felon (Pen. Code,[1] § 12021, subd. (a)(1)) (counts I, V, and XII); possession of ammunition by a felon (§ 12316, subd. (b)(1)) (counts II and VI); attempting to evade a police officer (Veh. Code, § 2800.2, subd. (a)) (count III); misdemeanor resisting and obstructing a police officer (§ 148, subd. (a)(1)) (count IV); child abuse likely to create great bodily harm (§ 273a, subd. (a)) (count VII); assault with a firearm (§ 245, subd. (a)(2)) (count IX); shooting at an inhabited dwelling (§ 246) (count X); and first degree burglary (§ 459) (count XI). Various enhancement allegations were also found true. Defendant was sentenced to 10 years plus 25 years to life in prison.

Defendant contends there is insufficient evidence to support two of the counts, and that the trial court committed sentencing error.

## I.  FACTUAL BACKGROUND

### A.  *Events of November 17, 2004*

On November 17, 2004, defendant was driving a car with 16-year-old Kayla in the passenger seat.[2] Police Officer Richard Celli of the Santa Rosa Police Department saw that the car had expired registration tags. He put on his overhead lights and siren to signal defendant's car to pull over. The car signaled to the right but continued on the road. Celli pursued defendant, who evaded him and sped through a stop sign without stopping. After going through a red light, defendant's car collided with a telephone pole, spun around, and hit a metal post.

### B.  *Events of November 23, 2004*

On November 23, 2004, Rhonda Oliva and Sebastian Fent were at Oliva's home, along with Oliva's three-month-old baby, defendant's son. In the middle of the night, defendant began banging on the front door, tearing off the screen door. He moved to the bedroom window and tore at the window

---

[1] All undesignated statutory references are to the Penal Code.

[2] At trial, Kayla testified that defendant had asked her to go with him to direct him to the house of a friend who would give defendant a tattoo. Earlier, she had told police officers that she had asked defendant for a ride.

screen while yelling. Fent called 911 and went to the garage to get a bat, then went into the kitchen and locked the door between the kitchen and the garage.[3] Fent heard a crash or bang in the garage, and defendant began pounding on the door leading from the garage to the kitchen. He fired three or four shots through the kitchen door. Two of the shots hit Fent's legs.[4]

## II.  DISCUSSION

### A.  *Shooting at Inhabited Dwelling*

Defendant contends his actions do not fall within the purview of section 246, arguing that because he discharged the gun while he was already *inside* Oliva's home—that is, in the garage—he could not have shot *at* the dwelling. Section 246 provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar . . . or inhabited camper . . . is guilty of a felony . . . ."

In *People v. Stepney* (1981) 120 Cal.App.3d 1016, 1018–1021 [175 Cal.Rptr. 102] (*Stepney*), the court distinguished between firing "at" a dwelling and firing "within" a dwelling. In that case, the armed defendant climbed into an occupied building through a window and fired a bullet into a television set while he was in the living room. (*Id.* at p. 1018.) The defendant was convicted of violating section 246 and appealed the sentence, contending the statute only prohibited shooting at the structure from the outside. (*Stepney*, at p. 1018.) The court noted that in reading the statute, "[a]n argument can be made that one can shoot *at* a building or automobile from within as well as from without." (*Id.* at p. 1019.) The court maintained that when there is a perceived ambiguity in a statute, "it is well settled that the court must construe that ambiguity in favor of the defendant. When language reasonably susceptible of two constructions is used in penal law, ordinarily that construction more favorable to the defendant will be adopted. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in the statute. [Citation.]" (*Ibid.*) Following this rule, the court reversed the conviction, holding that "the firing of a pistol within a dwelling house does not constitute a violation of Penal Code section 246." (*Id.* at p. 1021.)

The Attorney General acknowledges *Stepney*'s holding, but argues that defendant's actions are closer to those at issue in *People v. Jischke* (1996) 51

---

[3] The garage was attached to the house by a door leading to the kitchen. The door leading from the backyard to the garage did not lock, and had been left open.

[4] Counts I and II arose from an incident on August 4, 2004. The facts of that event are not pertinent to the issues on appeal, and we will not recite them here.

Cal.App.4th 552 [59 Cal.Rptr.2d 269]. There the court affirmed a section 246 conviction where the defendant had fired a gun at the floor of his apartment into the apartment below. The defendant, relying on *Stepney*, argued that since he was inside a dwelling when he fired the shot, he could not be convicted under section 246. (*Jischke*, at p. 556.) The court disagreed and explained that "[i]n shooting through his own floor, defendant necessarily shot into and 'at' the adjacent dwelling unit." (*Ibid.*)

■ To resolve this issue, we must decide whether defendant was inside the dwelling house or occupied building when he fired shots from the attached garage into the kitchen. The court in *People v. Adams* (1982) 137 Cal.App.3d 346, 354–355 [187 Cal.Rptr. 505] (*Adams*), considered a related issue and concluded a garage was part of an occupied building. The defendant there had been convicted under section 246 after he discharged a firearm from outside into a garage. (*Adams*, at pp. 349–350.) He challenged his conviction on the ground that shooting into a garage did not constitute shooting into an inhabited dwelling house within the meaning of section 246. (*Adams*, at p. 354.) The Court of Appeal rejected this argument, stating: "Section 246 by its express language does not limit itself to an inhabited dwelling house, but rather includes any 'occupied building.' The term 'building' is a generic term meaning any edifice or structure built by man. [Citation.] A 'building' is 'A structure . . . inclosing a space within its walls . . . .' [Citation.] The term 'building' would include such structures as outhouses, barns, garages, and an occupied building includes areas controlled by the occupants, such as a garage. [Citation.]" (*Ibid.*)

■ The court in *Adams* went on to note that "[t]he term 'inhabited dwelling' or 'house,' in section 246 has the same meaning as it has in the section defining first degree burglary" (*Adams, supra,* 137 Cal.App.3d at pp. 354–355, citing *People v. Chavira* (1970) 3 Cal.App.3d 988, 992 [83 Cal.Rptr. 851] (*Chavira*)), and that "[a]n attached garage may be an occupied building, thus susceptible to burglary" (*Adams, supra,* 137 Cal.App.3d at p. 355; see also *In re Christopher J.* (1980) 102 Cal.App.3d 76, 78–79 [162 Cal.Rptr. 147] (*Christopher J.*)). In *People v. Cook* (1982) 135 Cal.App.3d 785, 788–790 [185 Cal.Rptr. 576], for example, the defendant was convicted of first degree burglary after taking items from an attached garage and enclosed patio area at a residence. The Court of Appeal rejected his argument that he should have been convicted at most of second degree burglary because the garage and patio did not constitute an inhabited dwelling house within the meaning of section 460.[5] In doing so, the court stated: "The

---

[5] Section 460 defines burglary of an "inhabited dwelling house," inhabited vessel designed for habitation, floating home, trailer coach, or the inhabited portion of any other building as first degree burglary, and all other kinds of burglary as second degree burglary. Section 459 provides that anyone who enters any of various specified structures, including a house, with

problem with the argument, however, is that neither the garage nor the patio are separate structures; rather, they are an integral part of the . . . residence, entry into any part of which would be sufficient to constitute a burglary. [Citation.] [¶] . . . In the situation where the garage is an attached and integral part of the house, it is simply one room of several which together compose the dwelling. This is especially true where, as in this case, the garage can be reached through an inside door connecting it to the rest of the residence." (*Cook*, at pp. 795–796; accord, *Christopher J., supra*, 102 Cal.App.3d at pp. 78–79 [entry into carport that was "attached to and an integral part of the dwelling house" would constitute burglary].)

■  Defendant fired shots into the kitchen from an attached garage. The authorities we have discussed establish that he was not firing *at* an inhabited dwelling house or occupied building, but instead was firing *within* an inhabited dwelling, from one room of it into another. Following *Stepney*'s holding that "the firing of a [gun] within a dwelling house does not constitute a violation of Penal Code section 246" (*Stepney, supra*, 120 Cal.App.3d at p. 1021), we conclude that defendant's actions do not meet the elements of section 246.

Indeed, any other conclusion would conflict with the prosecution's own theory—which the jury accepted—that defendant committed burglary in entering the garage. Defendant was charged in count XI with violation of section 459, "in that the said defendant did enter an inhabited dwelling house and trailer coach and inhabited portion of a building." In closing argument, the prosecutor told the jury, "when you enter the garage and the garage is attached to the house, that's entering the residence. . . . The defendant entered a building, in this case the attached garage." The jury found him guilty of residential burglary.

The prosecutor acknowledged the apparent inconsistency between the theory that defendant entered the residence when he entered the garage, but that while in the garage, he shot "at" the residence, arguing to the jury: "I'm asking you to also make the finding that, once inside the garage, which is a residential burglary, he shot at the inhabited house, and what I'm referring to there is at the kitchen through the door to Sebastian Fent. And if that's a little confusing, we're not given very much guidance. How can you be in the residence and shoot into the residence? The law of burglary is very clear about entering a garage, you can have a burglary so long as the garage is attached. All this requires is that you shoot the firearm at an inhabited house. It doesn't give us any further definitions. . . . [¶] . . . 'At' means at, in the direction of, towards. Whatever 'at' means to you. But what we're asking you

intent to commit larceny or any felony is guilty of burglary, and defines " 'inhabited' " to mean "currently being used for dwelling purposes, whether occupied or not."

to find is, once he got into that garage and he's blasting away at that residence through that door into the kitchen, that's the inhabited house." Based on the law we have reviewed, the two crimes not only *appear* inconsistent, on the facts of this case they *are* inconsistent. As we have noted, "the phrase 'inhabited dwelling house' has the same meaning in section 246 as it has in section 460 of the same code, defining first degree burglary." (*Chavira, supra*, 3 Cal.App.3d at p. 992.) Defendant cannot have been *inside* the dwelling house for purposes of burglary and *outside* the same dwelling house for purposes of shooting at it.

We are not persuaded otherwise by the facts that the door from the backyard to the garage was open and that the door from the garage to the kitchen was locked when defendant fired shots through it. The law is clear that an attached garage is merely one room in a dwelling house. We see nothing in the presence of a locked door between the garage and the rest of the house to change that conclusion. Citing the statement in *Adams* that "[a]n attached garage may be an occupied building, thus susceptible to burglary" (*Adams, supra*, 137 Cal.App.3d at p. 355), the Attorney General seems to suggest that we treat the garage as an independent occupied building, rather than as part of the dwelling, and that we conclude defendant shot from an occupied building—i.e., the garage—into an inhabited dwelling house—i.e., the remainder of the house. This is too broad a reading of *Adams*. *Adams* relied for its statement on *Christopher J.*, which considered whether a minor was properly convicted of burglary of a carport, and stated: "[T]he issue is not, as minor contends, whether a carport is a 'building' within the statute, but rather, was the carport a part of the dwelling house. [¶] . . . [¶] Viewing the evidence in a light most favorable to the judgment, as we must, it is presumed that the carport was attached to and an integral part of the dwelling house. As such, even under the common law, an entry would constitute a burglary." (*Christopher J., supra*, 102 Cal.App.3d at pp. 78–79; cf. *People v. Picaroni* (1955) 131 Cal.App.2d 612, 617–618 [281 P.2d 45] [entry into garage that was separate building from dwelling house would not necessarily be entry of the inhabited dwelling].) Here, too, the garage was attached to and an integral part of the dwelling house.

Accordingly, defendant's conviction under section 246 must be reversed.

## B. *Care or Custody of Kayla*

Defendant contends his conviction of child endangerment must be reversed because there is insufficient evidence that he had "care or custody" of Kayla. Section 273a, subdivision (a), provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical

pain or mental suffering, or *having the care or custody of any child*, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered" is guilty of a crime punishable as either a misdemeanor or felony. (Italics added.)

"In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].) The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt. Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

Defendant contends that the terms "care or custody" apply only to a person who has assumed the responsibilities and duties of a caregiver, and points out that there is no evidence that Kayla was a relative, had lived with him, or had driven with him in the past.

■ Section 273a does not require that a defendant be related to a child. As stated in *People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [73 Cal.Rptr.2d 257], "[t]he terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." There is "no special meaning to the terms 'care or custody' beyond the plain meaning of the terms themselves" that is indicated or intended. (*Ibid.*) Interpreting *Cochran*, the court in *People v. Perez* (2008) 164 Cal.App.4th 1462, 1476 [80 Cal.Rptr.3d 500], stated: "[T]he relevant question in a situation involving an individual who does not otherwise have a duty imposed by law or formalized agreement to care for a child (as in the case of parents or babysitters), is whether the individual in question can be found to have undertaken the attendant responsibilities at all. 'Care,' as used in the statute, may be evidenced by something less than an express agreement to assume the duties of a caregiver. That a person did undertake caregiving responsibilities may be shown by evidence of that person's conduct and the circumstances of the interaction between the defendant and the child; it need not be established by an affirmative expression of a willingness to do so." (Fn. omitted.)

Kayla was physically in the care of defendant who was transporting her when he endangered her life by his conduct. As a passenger in his speeding

car, Kayla was deprived of her freedom to leave, and she had no control over the vehicle. The jury could reasonably conclude that in taking it upon himself to control Kayla's environment and safety, defendant undertook caregiving responsibilities or assumed custody over her while she was in his car. Viewing the record in the light most favorable to the trial court's judgment, we conclude that substantial evidence supports the verdict.

## C.  *Sentencing Error*

■ Defendant contends the trial court erred in imposing consecutive sentences on counts I, VII, and X because it failed to state on the record its reasons for its sentencing choice.[6] Although it is true that a trial court errs when it fails to state its reasons for imposing consecutive sentences (*People v. Powell* (1980) 101 Cal.App.3d 513, 518 [161 Cal.Rptr. 803]; § 1170; Cal. Rules of Court, rule 4.406(b)(5)), defendant waived this issue by failing to raise it in the trial court. ■ Our Supreme Court has ruled that "the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices," including its failure to state reasons for those choices. (*People v. Scott* (1994) 9 Cal.4th 331, 353 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) Consequently, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.)

■ Defendant also contends he was denied his constitutional right to a jury finding beyond a reasonable doubt to justify the imposition of consecutive sentences. He acknowledges that in *People v. Black* (2007) 41 Cal.4th 799, 820–823 [62 Cal.Rptr.3d 569, 161 P.3d 1130], our Supreme Court rejected this position, explaining that "[t]he determination whether two or more sentences should be served in this manner is a 'sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' " (*Id.* at p. 823.) As defendant recognizes, we are bound by this ruling. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Defendant also contends the trial court violated his constitutional rights in imposing the aggravated sentence for count X. Because we are reversing his conviction on this count, we need not discuss this contention.

---

[6] As we have discussed, we are reversing defendant's conviction on count X.

## III. DISPOSITION

The conviction of count X is reversed, and the matter is remanded for resentencing. After resentencing, the trial court is directed to prepare an amended abstract of judgment and to forward it to California's Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Reardon, Acting P. J., and Sepulveda, J., concurred.