Filed 6/25/25  P. v. Branner CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL BRANNER,<br><br>　　　Defendant and Appellant. | A167564<br><br>(Contra Costa County<br>Super. Ct. No. 01-22-01292) |

Defendant Gabriel Branner appeals a final judgment following his convictions for robberies that were committed on the same day against two small businesses.  The jury found true various enhancements, including that he was armed with a firearm.  The trial court also found true various aggravating factors and found no mitigating factors.  On appeal, Branner argues that the court abused its discretion in imposing a consecutive sentence as to one of the robbery counts.  Specifically, he contends that the court relied on two aggravating factors that were unsupported by the evidence—that the crime involved a threat of great bodily harm or a high degree of cruelty and that the victims were particularly vulnerable.  We disagree and affirm.

# I. BACKGROUND

## A. Procedural History

A felony information charged Branner with: (1) unlawful conspiracy to commit robbery with an uncharged co-conspirator (Pen. Code,[1] § 182, subd. (a)(1); count 1); (2) second degree robbery (§ 211; counts 2 to 4); and (3) unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5). With respect to count 1, the information alleged that Branner personally used a firearm (§ 12022.5, subd. (a)) and with respect to counts 2 and 4, that he was armed with a firearm (§ 12022, subd. (a)(1)). The information also alleged, with respect to counts 1 to 3, that Branner suffered a prior serious felony conviction (§ 667, subd. (a)(1)) and a prior strike (§§ 667, subds. (d), (e); 1170.12, subds. (b), (c)). Finally, the information alleged various aggravating factors under California Rules of Court, rule 4.421.[2]

Following trial, the jury found Branner guilty on all counts and found true the arming enhancement (§ 12022, subd. (a)(1)) and the special allegation that he suffered a prior serious or violent felony conviction (§ 667, subd. (a)(1)), which also constituted a prior strike (§§ 667, subds. (d), (e); 1170.12, subds. (b), (c)). Branner waived his right to a jury trial as to the aggravating factors, and the trial court found true six aggravating factors, including that the crime involved great violence, great bodily harm, threat of great bodily harm, or a high degree of cruelty (rule 4.421(a)(1)) and that the victims were particularly vulnerable (rule 4.421(a)(3)). The court also found no mitigating factors.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Further references to rules are to the California Rules of Court.

The trial court sentenced Branner to an aggregate term of 18 years in prison. It designated count 4 (robbery of the first massage spa employee) as the principal term and imposed an aggravated term of five years, doubled to 10 years for the prior strike conviction. On count 2 (robbery of the nail salon employee), the court imposed a consecutive term of one year, doubled to two years for the prior strike. On count 3 (robbery of second massage spa employee), the court imposed a consecutive term of one year and declined to apply the prior strike. On count 5 (possession of firearm), the court imposed a concurrent term of two years. The court then imposed an additional five years for the prior strike (§ 667, subd. (a)) but stayed the imposition of sentence on count 1 (conspiracy) under section 654. Finally, the court struck the arming enhancement pursuant to section 1385 and awarded Branner 359 days of custody credits. Branner timely appealed.

B. Robberies

On April 30, 2022, around 7:30 p.m., T.L. was working at the cash register of a nail salon in Daly City when he saw two men walk in with masks on.[3] He testified that one man was "making the round[s]" while "the other one stay[ed] put just to observe." The taller of the two men, who was wearing a black top and green pants, approached T.L. and pointed a gun at him. T.L. recalled that the gun was "camo" with a "tan slide." He started to walk away from the register but one of the two men told him to go back and stay there. T.L. could not recall what the men said but he opened the cash register's drawer and handed them approximately $230. The men then left

_____

[3] T.L. testified at trial with the assistance of a Vietnamese interpreter.

3

and "went straight across the street." At trial, T.L. identified Branner as one of the two robbers but was not sure if he was the one with the gun.

J.J. was at the salon getting her nails done when the robbery occurred. She testified that she was in the back pedicure area when the two men walked in. There were at least 20 other people in the salon at this time, including the workers. One of the men calmly said, "this is a robbery, put all the money in" while the other told everyone to put their phones away. The two men wore black hoodies and face masks and were in the salon for no more than three to five minutes. J.J. recalled that after the robbery, the men ran across the street and got into a white sedan, "possibly a Toyota Camry." She testified that one of the men may have had a gun but could not remember.

At approximately 8:50 p.m. that same evening, C.L. and Y.G. were working at a massage spa in Pinole when Branner and his accomplice "rushed through" the door.[4] They were both wearing face masks and "dark colored" clothing. The accomplice pointed a gun at Y.G.'s head and said something in English she did not understand. She testified it "was probably, 'Don't move, give us the money.'" Y.G. continued that she was "[s]cared to death" and "[t]hought [she] was going to lose [her] life at the moment." The accomplice pointed "at [her] back" and asked for money, and she gave him approximately $200 from her person and approximately $200 from the "drawer in the shop."

---

[4] C.L. and Y.G. do not speak much English and both testified at trial with the assistance of a Mandarin interpreter.

At this same time, Branner "handl[ed]" C.L. He showed her part of a gun that was protruding from his pocket and asked, "You want the money or you want the gun?" C.L. and Branner walked into a room where C.L.'s purse was; she handed it to him but asked that he leave behind her driver's license. Branner took all the money from her purse (about $400) and left the remaining contents and purse in another room. Branner then asked C.L. and Y.G. for their cell phones. The accomplice pointed his gun at them as he and Branner forced the victims into a back room. C.L. and Y.G. were "very scared" and stayed in the room until they heard the front door close. C.L. was crying and very nervous. After they came out of the room, they called their boss and noticed that "a bunch of lines and wires . . . were collected on the sitting area in the waiting room." The police later observed that "there were wires that had clearly been roughly removed [from the ceiling], like someone had ripped something out."

A little over two weeks later on May 17, 2022, the police conducted a traffic stop of a white Honda Civic driven by and registered to Branner. The police searched the car and found a satchel containing a tan-colored semi-automatic handgun. It was loaded with 16 rounds in its magazine and had a 9-millimeter round in its chamber. The gun was similar to the one seen in the surveillance video of the nail salon robbery. The police also found five ski masks in the backseat of the car that were "similar [in] style and color to the ski masks worn by both the suspects in [the] robberies."

## II. DISCUSSION

Branner argues the trial court erred in imposing a consecutive, instead of a concurrent, sentence as to count 3 (robbery of second massage spa

5

employee). The People counter that Branner forfeited this argument and that it lacks merit in any case. We find that Branner forfeited this argument on appeal. And even if we were to reach the merits, we would find no abuse of discretion by the court.

A. Forfeiture

"[T]he waiver doctrine . . . appl[ies] to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).) Consequently, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.) "Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices *at the hearing*." (*Id.* at p. 353, italics added.) Thus, a defendant must object to the court's imposition of a consecutive sentence at the sentencing hearing in order to preserve any challenge to that sentence on appeal. (*People v. Morales* (2008) 168 Cal.App.4th 1075, 1084; *People v. Bravo* (2025) 107 Cal.App.5th 1144, 1160.)

Branner contends that his failure to object at his sentencing hearing should be excused because "it would have been futile" after the trial court stated on the record that it " 'read and considered the mitigation packet,' " including his request for concurrent sentencing on all counts. We disagree.

Although reviewing courts " ' "have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile" ' " (*People v. Perez* (2020) 9 Cal.5th 1, 7–8), this futility exception only applies in " 'unusual circumstances' " or "extreme case[s]" (*People v. Riel* (2000) 22

6

Cal.4th 1153, 1212, italics omitted).  As explained in *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), the bar is quite high.  There, the California Supreme Court found that the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, created a trial atmosphere *so poisonous*" that defense counsel's continual objections would have been "futile and counterproductive to his client." (*Id*. at p. 821, italics added.)  Our high court therefore excused the defendant "from the legal obligation to continually object." (*Ibid*.)  By contrast, our high court in *People v. Hillhouse* (2002) 27 Cal.4th 469 declined to apply the futility exception because "[t]he trial atmosphere . . . was not poisonous . . . and the record fail[ed] to establish that objections would have been futile." (*Id*. at p. 502.)

As in *Hillhouse*, there are no "unusual circumstances" warranting the application of the futility exception here.  Nothing in the record suggests that the atmosphere at sentencing was "poisonous" or that Branner's objections would have been futile.  Indeed, "[r]outine defects in the [trial] court's statement of reasons are easily prevented and corrected if called to the court's attention" at the hearing. (*Scott, supra,* 9 Cal.4th at p. 353.)  Branner points to the fact that, by imposing consecutive sentences after considering Branner's mitigation packet, the trial court had already decided to deny his request for a concurrent sentence.  But the court did not indicate what sentence it would impose, much less any predispositions, before hearing argument from Branner.

The trial court also gave both parties an opportunity to further discuss the mitigating factors *after* commenting that it had "read and considered the mitigation packet" and *after* acknowledging that it "should make certain

findings regarding factors in mitigation." The court also gave Branner an opportunity to argue whether probation should be granted and if not, what his appropriate sentence should be. This indicates that the court had not yet made up its mind and may have considered an objection to consecutive sentences after it orally pronounced Branner's sentence. Because the record does not demonstrate that Branner's objections would have been futile, we find that Branner forfeited any argument against consecutive sentences.

B. <u>Consecutive Sentence on Count 3</u>

Even if Branner had not forfeited any challenge to consecutive sentences, we would reject it on the merits. Branner contends that the trial court abused its discretion in ordering that the sentence for count 3 run consecutive to the sentence for count 4. Although Branner concedes that a consecutive sentence may be supported by a single aggravating factor, he argues that the two factors the court presumably relied on to impose a consecutive sentence—that the crime involved a threat of great bodily harm and high degree of cruelty (rule 4.421(a)(1)) and that the massage spa victims were particularly vulnerable (rule 4.421(a)(3))—were not supported by the evidence.[5] We disagree.

1. *Procedural History*

With respect to the robbery of the massage spa employees (counts 3 and 4), the trial court found, among other things, that Branner committed a crime involving a threat of great bodily harm and a high degree of cruelty. The court noted that there were "threats to take the victims' lives" and that

---

[5] Branner does not argue that the trial court abused its discretion by relying on any impermissible factors or by failing to state its reasons for imposing a consecutive sentence.

"the way in which the robbery was carried out showed a level of cruelty beyond what would be necessary for the elements of a robbery."

The trial court also found that C.L. and Y.G. were particularly vulnerable victims, reasoning that the massage spa was "a very small business" and "a more private setting" than the nail salon, where at least 20 other customers and workers were present. The court noted that C.L. and Y.G. "were both physically small Asian females with limited language skills and . . . that they were extremely traumatized by what occurred . . . ." It continued that this "was a massage facility which in itself had a degree of privacy much larger than, for example, a restaurant or . . . the nail salon."

After finding that "the aggravating factors . . . far, far outweigh the mitigating factors," the trial court imposed a 10-year sentence on count 4 and a consecutive term of one year (one-third the midterm) on count 3.

### 2. *Law and Standard of Review*

"Any circumstances in aggravation or mitigation, whether or not the factors have been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial, may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's sentence in prison or county jail under section 1170(h); and [¶] (3) A fact that is an element of the crime." (Rule 4.425(b).) "Only one criterion or factor in aggravation is necessary to support a consecutive sentence." (*People v. Davis* (1995) 10 Cal.4th 463, 552.)

"It is well established a trial court has discretion to determine whether multiple sentences are to run concurrently or consecutively. [Citation.] Generally, this determination is a sentencing choice for which the trial court is required to state reasons on the record. [(Rule 4.406.)] . . . In the absence

9

of a clear showing of abuse, an appellate court will not disturb the trial court's exercise of discretion in this regard." (*People v. Lepe* (1987) 195 Cal.App.3d 1347, 1350.) On appeal, we review aggravating factor findings for substantial evidence. (*People v. Morgan* (2024) 103 Cal.App.5th 488, 520.)

### 3. *Threat of Great Bodily Harm or High Degree of Cruelty*

Branner argues that there was insufficient evidence that his robbery of the massage spa involved a threat of great bodily harm or a high degree of cruelty[6] because his actions were not "distinctively worse than what was necessary to commit the crime[s]." (CALCRIM No. 3224.) We disagree. Branner and his accomplice, both armed and wearing ski masks, rushed into the spa at night around closing time. His accomplice pointed a gun at Y.G.'s head while Branner showed C.L. part of his loaded handgun and threatened to use it against her if she did not give him money. C.L. was terrified and Y.G. thought she was going to die. After the victims handed over their money and cell phones, Branner and his accomplice forced the victims into a back room while his accomplice pointed a gun at them. Both Y.G. and C.L. were extremely scared and traumatized.

These facts are more than sufficient to establish that Branner used far more "force or fear" than necessary to commit the robbery. (§ 211.) Indeed, "the elements of force and fear do not need to be extreme for purposes of constituting robbery" which "means that the threat of bodily harm can frequently exceed the minimum requirement necessary for purposes of establishing robbery." (*People v. Ramos* (1980) 106 Cal.App.3d 591, 602, disapproved on another ground in *Scott, supra*, 9 Cal.4th 331.) For example, evidence that a "victim was forced to divulge his money at knife point and

---

[6] "An act discloses *cruelty* when it demonstrates the deliberate infliction of physical or mental suffering." (CALCRIM No. 3224.)

was subsequently shoved aside following seizure of his radio" is sufficient to support a finding that a robbery involved a threat of great bodily harm or a high degree of cruelty. (*Ramos*, at p. 602.) The actions of Branner and his accomplice are arguably far worse: they threatened to shoot the victims if they did not hand over their money and then forced the victims into a room at gunpoint.

Branner counters that he did not remove his gun or fire it and that "[n]either [he] nor his accomplice tied up or gagged the victims or inflicted unnecessary mental anguish such as vulgar threats, racial slurs, etc." In other words, his robbery of the massage spa *could* have been much worse. But the relevant standard is whether Branner's actions were "distinctively worse than what was *necessary* to commit the" robbery. (CALCRIM No. 3224, italics added.) That Branner and his accomplice did not inflict *even more* mental anguish on the victims than they did does not mean that the extreme trauma they did inflict was insufficient to support the aggravating factor finding by the trial court.

### 4. *Particularly Vulnerable Victims*

Branner next argues that C.L. and Y.G. were not particularly vulnerable victims because "they were together and not made defenseless by their age or a physical disability; robbed at work . . .; not tied up, sexually harassed or otherwise physically or mentally abused during the robbery; and not left without any means of calling for or seeking help after the robbery." We again disagree.

A " 'particularly vulnerable' victim is one who is vulnerable 'in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act. An attack upon a vulnerable

11

victim takes something less than intestinal fortitude.  In the jargon of football players, it is a cheap shot.' " (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321.)

As the trial court aptly observed, C.L. and Y.G. "were both physically small Asian females with limited language skills" and were robbed in "a massage facility which . . . had a degree of privacy much [greater] than . . . a restaurant."  That Branner, who was below six feet tall and "heavier" in "build," and his accomplice, who was "about six feet, or taller," were notably larger in stature than C.L. and Y.G. supports the court's vulnerability finding.  (See *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1103 [victim was petite]; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1323 [victim was half the defendant's size].)  Likewise, their decision to rob C.L. and Y.G. in the evening around closing time when there was no one else inside bolsters this finding.  As do C.L. and Y.G.'s "limited language skills."  (See *People v. Alvarado* (2001) 87 Cal.App.4th 178, 195 [victim was found particularly vulnerable where "the burglary occurred . . . at night, the victim [was] not a big woman, and she [spoke] only Portuguese"].)  Finally, Branner took C.L. and Y.G.'s cell phones, preventing them from calling for help after the robbery.  These facts are more than sufficient to support the court's finding that C.L. and Y.G. were particularly vulnerable victims.

### III.  <u>DISPOSITION</u>

The judgment is affirmed.

CHOU, J.

WE CONCUR:

JACKSON, P. J.
SIMONS, J.

A167564
*People v. Branner*